UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
----------------------------------------------------- X
                                            :
SYMMETRA PTY LTD,                           :
                                            :
                Plaintiff,                  :      **OPINION AND ORDER**
                                            :
            - against -                     :      **12 Civ. 8857 (SAS)**
                                            :
HUMAN FACETS, LLC and                       :
HELEN TURNBULL,                             :
                                            :
                Defendants.                 :
----------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION[1]

          Symmetra Pty Ltd. ("Symmetra") brings this action to recover for the

economic and reputational injuries it allegedly suffered at the hands of Human

Facets, LLC ("Human Facets") and Helen Turnbull (collectively, "Defendants")

following the breakdown of the parties' business relationship.  Symmetra alleges

seven causes of action for:  (1) intentional interference with contractual

relationships; (2) intentional interference with prospective economic advantage; (3)

---

[1]       The Court has subject matter jurisdiction over this action under 28
U.S.C. § 1332 because the parties are of diverse citizenship and the amount in
controversy exceeds $75,000.  *See* Amended Complaint ¶ 2  ("Am. Compl.").
Although the Amended Complaint inappropriate pleads diversity of citizenship as
though Human Facets, an unincorporated association, were a corporation, *see id.*,
there is sufficient basis in the record to conclude that the members of Human
Facets are all of diverse citizenship from Symmetra.

unfair competition; (4) defamatory injury to reputation; (5) injurious falsehood; (6) libel; and (7) slander.  Presently pending is Defendants' motion to dismiss the Amended Complaint for lack of personal jurisdiction.  For the following reasons, the motion is denied.

## II.   BACKGROUND

### A.   Facts

#### 1.   Relevant Parties

Symmetra,[2] an Australian corporation,[3] provides diversity and tolerance training sessions to corporate clients.[4]  Symmetra's clients include such blue-chip companies as Goldman Sachs, Credit Suisse, Novartis, IBM, Ernst & Young, ConocoPhillips, Shell, and Motorola.[5]  Heather Price is Symmetra's CEO.[6]

Human Facets is a limited liability company organized under the laws of, and conducting business in, Florida.[7]  Helen Turnbull, who lives in Florida, is

_____

[2]    Symmetra is the successor-in-interest to The Diversity Consulting Company Pty Ltd.  *See* Am. Compl. ¶ 4.  I will refer to both companies as "Symmetra."

[3]    *See id.*

[4]    *See id.* ¶ 11.

[5]    *See id*. ¶ 12.

[6]    *See* 5/9/13 Declaration of Heather Price ("Price Decl.") ¶ 1.

[7]    *See* 3/22/13 Affidavit of Human Facets ("Human Facets Aff.") ¶ 2.

Human Facets' owner and managing member.[8]  Like Symmetra, Human Facets provides consulting and training services on diversity and tolerance to corporate clients.[9]

### 2.      The Parties' Business Relationship

In 2010, Symmetra developed a corporate training program titled "Unconscious Bias."[10]  This program is "designed to identify and overcome latent and repressed cognitive associations, stereotypes, and preferences that can contribute to an intolerant and discriminatory office environment."[11]  In general, the program involves: (1) explaining to its client that its purpose is to ferret out unconscious biases in the workplace; (2) administering diagnostic tests to managers and officers to that end; (3) providing individualized diversity coaching based on the results of this test; (4) running group training sessions to combat unconscious bias; and (5) working with the Human Resources department of the client company to develop policies, practices, and procedures aimed at combating unconscious bias.[12]  Initially the program was deployed in Australia, where it went

---

[8]     *See* 3/22/13 Affidavit of Helen Turnbull ("Turnbull Aff.") ¶¶ 2, 10.

[9]     *See* Am. Compl. ¶ 5.

[10]    *See id.* ¶¶ 12, 15.

[11]    *Id.* ¶ 12.

[12]    *See id.* ¶ 13.

on to receive industry accolades.[13]

In order to run its Unconscious Bias programs, Symmetra contracted with Human Facets to use its unconscious bias assessment tool, "Cognizant," and engaged Human Facets' personnel to interpret Cognizant test results.[14]  Symmetra also engaged Human Facets to supply individualized coaching keyed to the results of the Cognizant tests.[15]  Turnbull was one of the diversity coaches engaged by Symmetra.[16]

The Unconscious Bias program met with success in Australia, leading Symmetra to contemplate rolling it out in the wider markets of the United States and Asia.[17]  Symmetra had previously engaged Human Facets on a case-by-case basis, writing a new (sub)contract for each new engagement;[18] but in August 2011, in anticipation of servicing these wider markets, the parties began negotiating a comprehensive long-term contract setting forth standard terms for future

---

[13]     *See id.* ¶¶ 14, 16.

[14]     *See id.* ¶¶ 15–16.

[15]     *See id.* ¶ 15.

[16]     *See id.*

[17]     *See id.*

[18]     *See id.* ¶ 16.

engagements.[19]

Unfortunately, they could not agree on several key terms, including the geographical scope of Symmetra's exclusive rights to Cognizant, the contours of the relationship between the parties in the United States — *e.g.*, who got which territories — and, last but not least, Human Facets' compensation.[20]  In April 2013, they agreed that they could not reach an agreement, and they executed a formal disengagement agreement that May.[21]  Under the terms of this agreement, Human Facets agreed to complete its three then-existing subcontracts with Symmetra, and the parties agreed that they would operate independently, while respecting one another's intellectual property.[22]

### 3.   Human Facets' Alleged Smear Campaign Against Symmetra

Symmetra alleges that its relationship with Human Facets had begun to sour as early as March 2012, when Turnbull, claiming to be offended by Symmetra's critique of her business expenditures, delayed sending Cognizant tests

---

[19]      *See id.*

[20]      *See id.* ¶ 17.

[21]      *See id.* ¶ 18.

[22]      *See id.*  Although both parties make repeated references to 'intellectual property,' it is not clear that either party possesses intellectual property in a form recognized by the laws of the United States.

to a corporate client of Symmetra.[23]  The situation allegedly devolved from there.

When the parties' negotiations failed in April 2012, Human Facets allegedly began

waging a "smear campaign" against Symmetra.[24]  Symmetra alleges that:

> Defendants have contacted, and continue to contact, Symmetra's existing and potential clients and business partners casting aspersions on Symmetra's qualifications and expertise in diversity consulting, falsely accusing Symmetra of misappropriating the Cognizant tool, falsely accusing Symmetra of copying Human Facets' teaching methods and ideas, and making other false and misleading statements suggesting that Symmetra engages in sharp business practices. Human Facets also has claimed credit for programs and innovations designed and implemented solely by Symmetra.[25]

In particular, Symmetra alleges on information and belief that, using

client information that it gleaned during its subcontracting relationship with

Symmetra, Human Facets contacted the New York executives of at least five

prospective clients of Symmetra between May 2012 and September 2012.[26]  In

each of these communications, Human Facets stated that Symmetra had

misappropriated Human Facets' intellectual property, and implied that engaging

---

[23]     *See id.* ¶ 20.

[24]     *Id.* ¶19.

[25]     *Id.*

[26]     *See id.* ¶¶ 21, 33.

Symmetra would embroil the company in a legal dispute.[27]  Symmetra further

alleges that as a result of these communications, it was not engaged by any of the

companies that Human Facets contacted.[28]

Additionally, Symmetra alleges that in September 2012, Turnbull sent

two e-mails to the president of QED Consulting, a New York diversity-consulting

company which Symmetra hoped to use to subcontract the work it had previously

given Human Facets.[29]  The first e-mail advised QED that Symmetra had "copied"

Human Facets' award-winning Cognizant product, and that Human Facets and

Symmetra were involved in a dispute over intellectual property.[30]  Citing concerns

raised by this e-mail, QED terminated its negotiations with Symmetra.[31]

### B.    Additional Jurisdictional Facts

Symmetra alleges the following additional jurisdictional facts.  *First*,

that Human Facets "employs or otherwise contracts with Barbara Berry, a Senior

---

[27]    *See id*. ¶ 33.

[28]    *See id*.

[29]    *See id.* ¶¶ 23–30.  *See also* E-mail from Turnbull to GED Consulting, Ex. A to 5/9/13 Declaration of Eric M. Creizman ("Creizman Decl."); E-mail from Turnbull to GED Consulting, Ex. B to Creizman Decl.

[30]    E-mail from Turnbull to GED Consulting, Ex. A to Creizman Decl.

[31]    *See* Am. Compl. ¶ 32.

Associate Consultant of Human Facets, who is based in Queens, New York."[32]

Specifically, Symmetra alleges that Human Facets employs Berry in order to

"create a permanent presence for Human Facets in New York, by delivering

workshops and marketing the services of Human Facets[;]" and that "Berry

continues to reside and maintain an office in New York, and is described on

Human Facets' website as a Senior Associate Consultant."[33]

        *Second*, Symmetra alleges that Defendants conducted business in New

York between 2007 and 2012.  In support of this allegation, Price testifies that

Turnbull visited New York in 2007 in order to establish a business relationship

with Symmetra,[34] and that for two days in 2008 Turnbull and she held marketing

meetings with New York companies.[35]  Price further testifies that Turnbull ran

diversity workshops in New York in 2009 and 2011 for Baker Hughes Industries, a

long-time client of Human Facets.[36]  Similarly, Price testifies that "Turnbull

---

[32]    *Id*. ¶ 8.

[33]    Price Decl. ¶ 11.

[34]    *See id*. ¶ 7.  *See also* E-mail from Turnbull to Price, Ex. C to Price Decl.

[35]    *See* Price Decl. ¶ 10. *See also* Schedule of Turnbull's meetings in New York, Ex. G to Price Decl.

[36]    *See* Price Decl. ¶ 13. *See also* E-mail from Turnbull to Price, Ex. U to Price Decl.

regularly markets by telephone, email, and tele-seminar[] to organizations in New York . . . ."[37] *Third*, and relatedly, Symmetra alleges, through Price's testimony, that "Human Facets has no clients at all in the State of Florida."[38]

*Fourth*, Symmetra alleges that it entered into a United States distribution agreement with Human Facets in 2007, and that in connection with this agreement, it "made clear that New York would be the focal point of any business Symmetra did in the United States. . . ."[39]  In keeping with this plan, the distribution agreement between the parties designated New York State for choice of law and forum.[40]

*Finally*, Symmetra alleges that in March 2012, Turnbull and Price attended a diversity consulting award ceremony in New York in order to solicit business clients.[41]  Price created a merged contact list based on the business prospects that she met at this event and sent it to Turnbull, who subsequently used

---

[37]  Price Decl. ¶ 12 (citations omitted).

[38]  *Id.* ¶ 6.

[39]  *Id.* ¶ 8.

[40]  *See id.  See also* Contract between Human Facets and Symmetra, Ex. E to Price Decl., at 13

[41]  *See* Price Decl. ¶ 14. *See* E-mail from Turnbull to Price, Ex. X to Price Decl.

it to send e-mails to New York companies disparaging Symmetra.[42]

      In support of this motion, Defendants allege that they have never (1) been licensed to do business in New York; (2) done business directly in New York; (3) maintained offices in New York; (4) had employees in New York; (5) held any accounts or assets in New York; or (6) paid taxes in New York.[43]

## III.   LEGAL STANDARD

### A.   Rule 12(b)(2) Motion to Dismiss

#### 1.   Standard of Proof

      A plaintiff has the burden of proving personal jurisdiction by a preponderance of the evidence.[44]  When assessed on written submissions, "a plaintiff need only allege facts constituting a *prima facie* showing of personal jurisdiction to survive a Rule 12(b)(2) motion."[45]  The plaintiff may make such a showing with "an averment of facts that, if credited, would suffice to establish

---

[42]    *See* Price Decl. ¶ 14.

[43]    *See* Turnbull Aff. ¶¶ 4–9, 12–17; Human Facets Aff. ¶¶ 1-17.

[44]    *See Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir. 1996).

[45]    *M & M Packaging, Inc. v. Kole*, 183 Fed. App'x 112, 114 (2d Cir. 2006) (alteration in the original) (citation omitted).

jurisdiction over the defendant."[46]  In this posture, the court must construe all allegations in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor.[47]  However, "a plaintiff may not rely on conclusory non-fact-specific jurisdictional allegations to overcome a motion to dismiss."[48]  Further, when a "defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction — and plaintiffs do not counter that evidence — the allegation may be deemed refuted."[49]

### 2.    Jurisdiction Under New York's Long-arm Statute[50]

A federal court sitting in diversity must "determine whether there is

---

[46]    *Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (quotation marks and citation omitted).

[47]    *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).  *See also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted).

[48]    *Doe v. Delaware State Police*, No. 10 Civ. 3003, 2013 WL 1431526, at *3 (S.D.N.Y. Apr. 4, 2013) (quotation marks omitted) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)).

[49]    *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 567 (S.D.N.Y. 2012) (quoting *Schenker v. Assicurazioni Genereali S.p.A., Consol.*, 98 Civ 9186, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002) (quotation marks omitted)).

[50]    Symmetra does not allege that general personal jurisdictions exists over the Defendants under Section 301 of the CPLR.

jurisdiction over the defendant under the relevant forum state's laws."[51]  Section

302 of New York's Civil Practice Law and Rules ("CPLR") provides in pertinent

part:

> (a)   As to a cause of action arising from any of the acts
> enumerated in this section, a court may exercise personal
> jurisdiction over any non-domiciliary, or his executor or
> administrator, who in person or though an agent:
>
>> (1)   transacts any business with the state or contracts
>> anywhere to supply goods or services within the
>> state; or . . .
>>
>> (3)   commits a tortious act without the state causing
>> injury to a person or property within the state, except
>> as to a cause of action for defamation of character
>> arising from the act, if he
>>
>>> (i)   regularly does or solicits business, or engages
>>> in any other persistent course of conduct, or
>>> derives substantial revenue from goods used
>>> or consumed or services rendered, in the state,
>>> or
>>>
>>> (ii)   expects or should reasonably expect the act to
>>> have consequences in the state and derives
>>> substantial revenue from interstate or
>>> international commerce. . . .

When invoking jurisdiction under section 302, "[a] plaintiff must

---

[51]     *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d
779, 784 (2d Cir. 1999).

establish the court's jurisdiction with respect to *each* claim asserted."[52]   "Section 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff or commits a commercial tort against plaintiff in the course of transacting business or contracting to supply goods or services in New York."[53]   Jurisdiction over a claim against a non-domiciliary defendant exists under section 302(a)(1) when: (1) the non-domiciliary "transacts [] business" within New York; and, (2) the claim against the non-domiciliary arises out of the defendant's business activity in New York.[54]   New York courts have rejected the 'fiduciary shield' doctrine, such that "section 302(a) [] confers jurisdiction over individual corporate officers who supervise and control an infringing activity[,]" even if those officers did business in New York only in their official capacity.[55]

        **a.**        **Section 302(a)(1)**

                **i.**        **The 'Transacting Business' Prong**

---

[52]    *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original).

[53]    *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (quotation marks, citations, and emphasis omitted).

[54]    *See CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (citation omitted).

[55]    *Chloe*, 616 F.3d at 164 (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988)).

For a non-domiciliary to "transact [] business" within the meaning of section 302(a)(1), it must purposely avail itself of the benefits and protections of New York's laws in conducting its activities in the state.[56]  Section 302 "is a single-act statute requiring but one transaction — albeit a purposeful transaction — to confer jurisdiction in New York."[57]  "[H]owever, when an individual act in New York will not suffice, an ongoing course of conduct or relationship in the state may."[58]

### ii.    The 'Arises From' Prong

To meet the 'arises from' prong of section 302(a)(1), a "substantial nexus" must exist between the out of state defendant's transaction of business in New York and the claim alleged.[59]  In order to meet this requirement, there must be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the

---

[56]    *See id.* (citations omitted).

[57]    *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) (citing *CutCo Indus.*, 806 F.2d at 365) (emphasis removed).  *Accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 62 (2d Cir. 2012) ("A single act within New York will, in the proper case, satisfy the requirements of section 302(a)(1).") (citations omitted).

[58]    *Licci ex rel. Licci*, 673 F.3d at 62 (citations omitted).

[59]    *See id.* (citations omitted).

-14-

claim. . . .  [T]he 'arise-from' prong limits the broader 'transaction-of-business'

prong to confer jurisdiction only over those claims in some way arguably

connected to the transaction."[60]

### b.      Section 302(a)(3)

Under section 302(a)(3) of the CPLR, a court may exercise personal

jurisdiction over a non-domiciliary who committed a tort outside of New York that

caused injury within New York.

> The conferral of jurisdiction under [Section 302(a)(3)(ii)] . . . rests
> on five elements: *First*, that defendant committed a tortious act
> outside the State; *second*, that the cause of action arises from that
> act; *third*, that the act caused injury to a person or property within
> the State; *fourth*, that defendant expected or should reasonably
> have expected the act to have consequences in the State; and *fifth*,
> that defendant derived substantial revenue from interstate or
> international commerce.[61]

The same test applies for assessing jurisdiction under Section 302(a)(3)(i), except

that instead of the last two elements, the defendant must: (1) engage in conduct in

New York that is regular, persistent, or substantial; or (2) derive substantial

revenue from goods sold and consumed in New York or services performed in

---

[60]      *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339–40 (2012)
(answering certified question from the Second Circuit) (citation omitted).

[61]      *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000) (emphasis
added).

New York.[62]

        In determining where an injury took place for the purposes of Section 302(a)(3), New York courts apply the "situs of the injury" test.[63]  "The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff[,] . . . [and] the situs of a nonphysical, commercial injury is where the critical events associated with the dispute took place."[64]

### c.      Jurisdiction over a Claim For Defamation

        Sections 302(a)(2) and (3) of the long-arm statute expressly exclude actions for defamation, due to the judgment of New York's legislature that subjecting out of state defendants to suit in New York solely on the basis of defamation would chill free expression.[65]  However, personal jurisdiction over a

---

[62]    *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 200 (2d Cir. 1990) ("The few cases on point indicate that in order to sustain jurisdiction under section 302(a)(3)(i), plaintiffs must demonstrate more than substantial revenue from sales to a New York entity, they must make some showing that the associated goods are 'used or consumed' in New York.").

[63]    *Bank Brussels Lambert*, 171 F.3d at 791.

[64]    *V Cars, LLC v. Israel Corp.*, 902 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) (quotation marks and citations omitted).

[65]    *See Legros v. Irving*, 327 N.Y.S.2d 371, 372 (1971) (citations omitted) (interpreting the legislative history, and advisory committee notes, of the CPLR's defamation exceptions).  *Accord SPCA of Upstate New York, Inc. v.*

claim for defamation may still be obtained under the transacting-business prong of the long-arm statute.[66]  As New York's Court of Appeals has explained:

> There is a clear distinction between a situation where the only act which occurred in New York was the mere utterance of the libelous material and on the other hand, a situation where purposeful business transactions have taken place in New York giving rise to the cause of action.  Where purposeful transactions of business have taken place in New York it may not be said that subjecting the defendant to this State's jurisdiction is an unnecessary inhibition on freedom of speech or the press.[67]

In keeping with this rationale, New York courts interpret "transacting business" under section 302(a)(1) "more narrowly in defamation cases."[68] Specifically, although the CPLR is a 'single act statute,' "[i]n defamation cases . . . the 'single act' of uttering a defamation, no matter how loudly, is not a 'transaction of business' that may provide the foundation for personal jurisdiction."[69]

_____

*American Working Collie Ass'n*, 18 N.Y.3d 400, 404 (2012) (citations omitted).

[66]    *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 245-46 (2d Cir. 2007) ("Under New York law, when a person utters a defamatory statement without the state that causes injury to the plaintiff within the state, jurisdiction may be acquired under section 302(a)(1), even though section 302(a)(3) — which explicitly concerns jurisdiction as to out-of-state tortious acts that cause in-state injury — excludes defamation cases from its scope.").

[67]    *Legros*, 327 N.Y.S.2d at 373.

[68]    *Best Van Lines*, 490 F.3d at 248 (quotation marks and citations omitted).

[69]    *Id.* (quotation marks and citations omitted).

-17-

However, a court may exercise jurisdiction over a claim for defamation where "the defendants' out-of-state conduct involve[s] defamatory statements projected into New York and targeting New Yorkers, . . . [and] the conduct also include[s]" further acts solidifying the defendant's connection with New York.[70]

In addition to holding that a single defamatory statement is insufficient to give rise to long-arm jurisdiction, New York jurisprudence otherwise imposes a stricter standard on the transaction-of-business and arising-from prongs of section 302(a)(1) in defamation cases.  As to claims for defamation, "particular care must be taken to make certain that non-domiciliaries are not haled into court in a manner that potentially chills free speech without an appropriate showing [] that they purposefully transacted business here and that the proper nexus exists between the transaction and the defamatory statements at issue."[71]

Under this standard, jurisdiction is more likely to lie when the defendant's contacts with New York were in preparation for the defamatory statement — for example, staying in New York to research a defamatory book or

---

[70]    *Id.* at 249 (citing *Sovik v. Healing Network*, 665 N.Y.S.2d 997 (4th Dep't 1997 (finding jurisdiction under section 302(a)(1) where plaintiff sent single defamatory letter to defendant, and also drafted and/or authorized the letters' distribution while staying in the Buffalo area)).

[71]    *SPCA of Upstate New York*, 18 N.Y.3d at 405.

-18-

news broadcast.[72]  Likewise, jurisdiction is more likely to lie when the allegedly

defamatory statements were purposefully "written in or directed to New York[,]"

as opposed to reaching the forum fortuitously, as by an internet forum post

accessible by the world at large.[73]  In sum, personal jurisdiction will exist over a

claim for defamation under section 302(a)(1) only upon a heightened showing of:

(1) defendant's *purposeful* transactions of business in New York; and/or (2) a

causal link between this transaction of business and the claim alleged.

      A plaintiff may not escape the special rules applicable to allegations

of defamation through artful pleading: when a claim, however denominated,

sounds in defamation, the CPLR's defamation rules apply.[74]  "Courts [] look to the

substance, not merely the name, of a claim in order to determine whether that claim

---

[72]    *See id*. at 404 (citing *Montgomery v. Minarcin*, 693 N.Y.S.2d 293 (3d Dep't 1999) (holding that an allegedly defamatory news report written and researched in New York over a six-week period prior to being broadcast in New York was sufficient to support transaction of business within the state)) (further citations omitted).

[73]    *Id*.

[74]    *See Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996) ("Plaintiffs may not evade the statutory exception by recasting their cause of action as something other than defamation.") (holding that claims of claims of injurious falsehood and tortious interference with prospective economic advantage were subject to defamation exception of sections 302(a)(2 and (3), because the entire complaint sounded in defamation) (citations omitted).

sounds in defamation."[75]

### 3. Due Process

The Supreme Court set forth the requirements of due process in *International Shoe v. Washington*: that a defendant "not present within the territory of the forum" have "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[76]  This analysis requires both a "minimum-contacts" test and a "reasonableness" inquiry.

*First*, to satisfy minimum contacts for due process, the plaintiff must demonstrate that "the defendant purposely availed itself of the privilege of doing business in the forum and could foresee being haled into court there" and that "the claim arises out of, or relates to, the defendant's contacts with the forum."[77] *Second*, if the defendant's contacts with the forum state satisfy this test, the defendant may defeat jurisdiction only by presenting "a compelling case that the

---

[75]    *Morsy v. Pal-Tech, Inc.*, No. 07 Civ. 2143, 2008 WL 3200165, at *5 (S.D.N.Y. Aug. 7, 2008) (citations omitted).

[76]    326 U.S. 310, 316 (1945) (quotation marks and citations omitted).

[77]    *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (quotation marks and citations omitted).

presence of some other considerations would render jurisdiction unreasonable."[78]

"[Courts] consider five factors [in] determining whether an exercise of jurisdiction is reasonable: . . . '(1) the burden on the defendant, (2) the interests of the forum State, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, [and] (5) the shared interest of the several States in furthering fundamental substantive social policies.'"[79]

## IV.  DISCUSSION

Before delving into the technical nuances of Defendants' motion, it is helpful to take stock of the wider picture painted by Symmetra.  Symmetra alleges that it once worked with Human Facets, but now competes with it; that both are in the same industry; and that each solicits clients in New York to do business domestically and internationally.  Symmetra also alleges that the Defendants obtained proprietary information during their relationship with it, and, from the safety of Florida — where they have no clients — used this information in a campaign directed at crippling Symmetra's ability to do business in New York.

_____

[78]  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  *Accord Chloe*, 616 F.3d at 173.

[79]  *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987)).

Symmetra further alleges that the proprietary information fueling Defendants'

campaign was derived, in part, from meetings that the parties held in New York.

Finally, Symmetra alleges that Defendants intend to establish a permanent foothold

in the New York market, and have already taken substantial steps to that end.

Common sense dictates that a company using information gathered in

New York to wage war on another company's New York business prospects would

not be immune to being haled into a New York forum merely because it *launched*

its attack elsewhere.  Of course, the commonsensical resolution of a legal dispute

must yield where a contrary result is dictated by law.  In this case, though, common

sense and the law are not in conflict.

Defendants make two principal arguments in support of this motion.

*First*, that there is no basis for jurisdiction under the CPLR, because Symmetra's

entire Complaint sounds in defamation, and *second*, that exercising jurisdiction

would be unreasonable under the due process clause.[80]  For the following reasons,

both arguments are unavailing.

### A.   Long-arm Jurisdiction

#### 1.   Jurisdiction under Section 302(a)(3) of the CPLR (tort committed without the state)

---

[80]   *See* Defendants' Memorandum of Law in Support of Its [sic] Motion to Dismiss the Amended Complaint ("Def. Mem.") at 2.

Despite Defendants' repeated assertions to the contrary, it is not the case that the entire Complaint "sounds in defamation."[81]  One example is Symmetra's cause of action for unfair competition.[82]  In the Amended Complaint, Symmetra alleges that Defendants obtained confidential information regarding Symmetra's past, existing, and prospective clients during their business relationship with Symmetra, and then used this information to unfairly compete.[83]  Price's declaration clarifies that Defendants received a list of Symmetra's prospective New York clients that she had gathered at a New York event together with Turnbull, and then used this list to malign Symmetra.[84]

These facts, which Defendants have not specifically controverted, establish that Symmetra's unfair competition claim does not sound in defamation for the purposes of the CPLR.[85]  Under New York law, a claim for unfair competition will lie where a business misappropriates the confidential and

---

[81]     Defendants' Reply Memorandum of Law in Support of Its [sic] Motion to Dismiss the Amended Complaint ("Reply Mem.") at 3 (quotation marks and citation omitted).

[82]     *See* Am. Compl. ¶¶ 42–47.

[83]     *See id.*

[84]     *See* Price Decl. ¶ 14.

[85]     *Cf. Morsy*, 2008 WL 3200165, at *5 (noting that New York courts look to the substance of the claim alleged to determine whether the CPLR's special rules for defamation claims apply).

proprietary information of a competitor, *e.g.*, customer lists, and wrongfully uses this information to further its own business interests.[86]  In substance, this is what Symmetra alleges in the Amended Complaint.

Although the last acts causing injury — *i.e.*, Turnbull's e-mails to New York companies disparaging Symmetra — were defamatory, "[t]here is no requirement that jurisdiction be grounded upon either the final act or the ultimate act causing the injury."[87]  Thus, jurisdiction here may rest on Defendants' actions in the run-up to the act that completed the tort.

Similarly, Symmetra could potentially recover for its unfair competition claim even if its defamation claim is dismissed: indeed, it is possible that merely using the list to contact Symmetra's prospective customers would be actionable.  In short, because Symmetra has alleged facts in support of its claim for unfair competition that go beyond the predicates of a claim for defamation, the CPLR's defamation exceptions present no bar to exercising personal jurisdiction over the claim.[88]

---

[86]    *See, e.g., Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 869 N.Y.S.2d 465, 471 (1st Dep't 2008).

[87]    *McNamee v. Clemens*, 762 F. Supp. 2d 584, 597 (E.D.N.Y. 2011) (quotation marks and citations omitted).

[88]    *Cf. Treppel v. Biovail Corp.*, No. 03 Civ. 3002, 2004 WL 2339759, at *6 (S.D.N.Y. Oct. 15, 2004) (holding that the exception for defamation found in

It follows from this conclusion that long-arm jurisdiction may be exercised over this claim under section 302(a)(3) of the CPLR (tort committed without the state and causing injury within the state). Although controlling precedent establishes that the e-mails that Turnbull sent to New York companies cannot provide a self-sufficient basis for jurisdiction over this claim, it is relevant that Turnbull purposefully directed the disparaging e-mails to New York.[89] Moreover, the situs of injury is New York, because the critical events giving rise to the injury took place in New York, and New York is where Symmetra suffered its injuries.[90] And, as discussed above, the claim for unfair competition arose out of Defendants' contacts with New York. Finally, Symmetra has sufficiently alleged

---

CPLR section 302(a)(2) (tortious acts committed within the state) did not bar plaintiff's claim for tortious interference with prospective economic advantage, where plaintiff had alleged additional facts beyond a defamatory utterance, *e.g.*, that defendant had "wrongfully obtained [plaintiff's] personal account records and records").

[89]    *See SPCA of Upstate New York*, 18 N.Y.3d at 405.

[90]    *See Penguin Grp.*, 16 N.Y.3d at 303 (allegations that defendant "acquired [] trade secrets at issue in New York and, further, that the defendant's unfair competition threatened to pilfer [the plaintiff]'s significant New York customers[]" are sufficient to support jurisdiction under section 302(a)(3)) (citing *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 201 (1978)). *See also Pincione v. D'Alfonso*, No. 11 Civ. 4231, 2012 WL 6621370, at *3 (2d Cir. Dec. 20, 2012) (summary order) ("Generally, with commercial torts, the situs of the injury is New York if the plaintiff raises the inference that the tortious conduct caused him to lose business or customers within the state.") (citations omitted).

that Defendants derive substantial revenue from interstate and/or international commerce.[91]  Accordingly, I find that Symmetra has met its burden of pleading a *prima facie* case that personal jurisdiction exists over its unfair competition claim under section 302(a)(3)(ii).

The same analysis applies to Symmetra's two remaining non-defamation claims, for intentional inference with contractual relations and intentional interference with prospective economic advantage.  On the merits, it is possible that these claims — taken collectively — merely duplicate Symmetra's claim for unfair competition.[92]  As a jurisdictional matter, though, neither claim sounds in defamation.  Both claims arise from Defendants' New York contacts that are separate and apart from a bare claim for defamation — namely, the knowledge of Symmetra's existing and prospective contracts that Defendants gleaned while marketing with Symmetra in New York.  Defendants' motion to dismiss is therefore denied as to both claims.

### 2.      Jurisdiction under Section 302(a)(1) (transaction of business in New York)

Symmetra's remaining claims — for defamatory injury to reputation,

---

[91]     *See, e.g.,* Price Decl. ¶¶ 3, 6–14; Am. Compl. ¶¶ 5-8; Def. Mem. at 4–5 (acknowledging that Defendants derived revenue from international clients).

[92]     *Compare* Am. Compl. ¶¶ 34–41 *with id.* ¶¶ 42–47.

libel, slander, and injurious falsehood — all sound in defamation.  Thus, the only possible basis for jurisdiction over these claims is under CPLR section 302(a)(1). Because all of these claims appear to share factual underpinnings identical for jurisdictional purposes, I will consider them together.

Controlling precedent establishes that jurisdiction over a claim for defamation will lie under this section only if the plaintiff shows that: (1) the defamatory utterance was purposefully directed at New York, as opposed to reaching New York fortuitously; and (2) the defendant transacted other business in New York that was directly connected to the claim asserted.[93]  Based on the pleadings and submissions of the parties, and drawing appropriate inferences in Symmetra's favor, I conclude that Symmetra has made this showing.

*First*, Symmetra alleges, and Defendants do not contest, that the defamatory communications at issue were purposefully directed to New York, as opposed to reaching the forum fortuitously.  This weighs in favor of finding jurisdiction.

*Second*, "the connection between" the purposeful defamatory

---

[93]     *Compare Licci*, 20 N.Y.3d at 339 (a causal nexus under section 302(a)(1) requires only "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former"), *with SPCA of Upstate New York*, 18 N.Y.3d at 405 (meeting section 302(a)(1)'s nexus requirement for defamation claims requires a "substantial relationship between the allegedly defamatory statements and defendants' New York activities[]").

communications and Defendants' transactions of business in New York is sufficiently "direct[]" to confer jurisdiction.[94]  Symmetra seeks to recover for damage allegedly done to its reputation and business interest in New York by a business competitor.  The submissions of Symmetra, if credited by the ultimate trier of fact, would establish that:

    (1)    the breakdown of Symmetra's relationship was caused, in part, by disagreements about the parties' territorial rights, including rights related to the New York market;

    (2)    the parties had a long-running contract with choice of forum and venue in New York, and contemplated using New York as a beachhead to penetrate the American diversity-consulting market;

    (3)    Defendants regularly solicit New York clients in New York;

    (4)    Defendants hold out on their website that they have an 'associate' in New York, and contract with this associate in order to have a presence in the New York market; and

    (5)    Defendants attended New York marketing events with Symmetra, and used proprietary information derived from these

---

[94]    *Mantello v. Hall*, 947 F. Supp. 92, 100 (S.D.N.Y. 1996).

events to hamper Symmetra's business activities in New York.
Under the circumstances, these propositions, if credited by the trier of fact, would
establish a sufficient nexus between Defendants' contacts with New York and the
claims alleged by Symmetra to support jurisdiction over the defamatory claims
under section 302(a)(1).

Importantly, the focal point of Symmetra's claims is the business
injury it suffered in New York by way of Defendants' allegedly tortious acts
directed at the New York market.  This fact broadens the scope of the contacts
relevant to the jurisdictional inquiry to encompass all of Defendants' business
contacts with New York directly connected to Symmetra's claims.[95]  Because New
York, as a worldwide center of commerce, has "unique resources in the" field of
diversity consulting, and "[Symmetra's] claims arose out of [Defendants'] []
purposeful activity [directed at New York]," — including both the defamatory e-
mails, and Defendants' other business operations in the New York market — this
Court may properly exercise long-arm jurisdiction.[96]

---

[95]     *Cf. McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981) (finding, under
section 302(a)(1) of the CPLR, that no articulable nexus existed between
company's shipment of fondue pot that injured New York resident and general
marketing visits of its executives to New York).

[96]     *McNamee*, 762 F. Supp. 2d at 598.  Defendants make two additional
arguments against finding jurisdiction that I summarily reject.  *First*, because the
claims alleged do not sound in contract, Defendants' argument that personal

**B.**     **Exercising Jurisdiction over Defendants Comports with Due Process**

Exercising jurisdiction in this case easily comports with due process. Defendants' assertion that, if jurisdiction may be exercised here, then "any person who at any time traveled to New York on business would be subject to personal jurisdiction in that state[]" borders on frivolous.[97]  Defendants did not merely pass through New York on business; instead, if Symmetra's allegations are credited, Defendants are engaged in a long-term plan to solicit business in the New York market, and have purposefully committed tortious actions aimed at squeezing Symmetra out of New York.

The contacts discussed above giving rise to my finding that Defendants transacted business under the CPLR also show that Defendants have

---

jurisdiction does not lie because the center of gravity of the parties' contracts was not in New York is inapposite.  *See, e.g.*, Reply Mem. at 6-8 (citations omitted). Here, the parties' contracts are relevant only to the extent that they evidence that both parties have a business interest in New York; whether New York has an interest in adjudicating a contract dispute between the parties is beside the point. *Second*, Defendants argue that Turnbull is not subject to jurisdiction, because her contacts with New York were in her official capacity.  *See* Reply Mem. at 8 (citations omitted).  This argument misses the mark.  Symmetra has adequately alleged that Turnbull purposefully contacted the New York forum — *e.g.*, through her e-mails and marketing activities in New York — and New York courts rejected the fiduciary shield doctrine long ago.  *See Kreutter*, 71 N.Y.2d at 472 (holding that "the fiduciary shield rule is not available to defeat jurisdiction under the New York long-arm statute").

[97]     Reply Mem. at 2.

-30-

sufficient minimum contacts with New York under the due process clause.  And it is not unreasonable to exercise jurisdiction in the circumstances.  Defendants seek to overcome New York's clear interest in adjudicating this dispute, which concerns the smooth operation of New York markets, by arguing that it would be inconvenient for Turnbull and her lawyers to travel to New York from Florida.[98] Given that Defendants purposefully directed their activities at New York, and the allegations that Turnbull has often traveled to New York on business, I reject this argument.[99]

Finally, I note that the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment, presents no bar to jurisdiction here. The Supreme Court has "categorically [rejected] the suggestion that invisible radiations from the First Amendment may defeat jurisdiction otherwise proper under the Due Process Clause."[100]

---

[98]     *See* Reply Mem. at 14-15 (citations omitted).

[99]     *Cf.*, *e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir. 2000) (noting that once minimum contacts have been shown, defendant must come forward with a compelling case that exercising jurisdiction would be unreasonable, and holding that New York forum would not be unreasonable forum for foreign defendants).

[100]    *Keeton v. Hustler Magazine, Inc.*,  465 U.S. 770, 781 n.12 (1984) (citation omitted).

## V.   CONCLUSION

For the foregoing reasons, the motion is denied.  The Clerk of the

Court is directed to close this motion (Docket No. 13).  A conference is scheduled

for July 12, 2013 at 4:30 p.m.


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:       New York, New York
             June 13, 2013


-32-

**-Appearances-**

**For Plaintiff:**

Eric M. Creizman, Esq.
Creizman, LLC
565 5th Ave., Fl.7
New York, NY 10017
(212) 972-0200

**For Defendants:**

Jan Douglas Atlas, Esq.
Kopelowitz Ostrow Ferguson Weiselberg Keechl
200 S.W. 1st Avenue
Suite 1200
Fort Lauderdale, FL 33301
(954) 523-4100